The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Be seated please. The third case is 23-1950 Selective Insurance Company of South Carolina v. Duffy. Mr. Duran. Yes, Your Honor. I don't mind a brief pause to wait for Ms. Barroneau if Your Honor would prefer. We'll take a moment. All right. Thank you. May it please the court. My name is Michael Duran. I am the attorney for the appellants Adam and Lydia Duffy. We are here today to decide if a million dollars in coverage for a loss that exceeded a million dollars is actually a million dollars in coverage. The issue has been stated several different ways in the briefs and for the record, I would ask the court to allow us to rely on our briefing in the opening brief as well as the reply brief. As part of this presentation and with that initial start, I would tell the court that we're dealing with a case with a fairly complicated history on a fairly simple issue. Mr. Duffy had coverage through Selective Insurance and three other insurance companies for a very serious loss that occurred on September 30, 2016. He and his wife were riding on a motorcycle. They were severely injured when another vehicle negligibly drove into them. It created very catastrophic injuries that resulted in a long period of medical treatment. It resulted in a loss determination that ultimately was found to be that Mr. Duffy himself, Adam Duffy suffered in excess of a million dollars worth of compensatory damages. That was the responsibility of an underinsured motorist and his wife's damages exceeded $600,000. The total award they received through an arbitration proceeding that they started against Selective Insurance came to $1,900,000 total for all damages. While Duffy started civil actions to pursue their compensatory claims, Selective decided to start this federal action seeking a declaration that their million dollars in coverage was not a million dollars in coverage. And then we had to resist that case while we were trying to prove exactly how much the Duffys lost because Selective stubbornly refused to acknowledge how significant their loss was. And even though their loss significantly exceeded the reduced policy limits that Selective argued for and the full policy limits that we argued for, they still insisted they go through that arbitration process and prove an actual number that well exceeded both the stated coverage in the policy and Selective's incorrect reduction of that policy limits. So it's had a long history. It started out in the spring of 2020. Just at the start of COVID, we had a federal case started in declaratory action. We moved to dismiss that case on the grounds that it was too early to decide what the coverage was until they admitted how much the damages were. We actually got a federal court order in this case staying this action until that arbitration proceeding was completed. We completed the arbitration proceedings in September of 2021. Had the stay lifted in January of 2022, and then had an order lifting the stay in April of 2022, and we filed our answer in this action in June of 2022. After the case was pending for a year with no particular action procedurally, Selective filed a motion for summary judgment against the Duffys seeking to have the court declare that they were right. They didn't present any evidence other than the pleadings of record. They didn't submit any affidavits, and the Duffys responded also by not submitting any evidence, relying on the pleadings that were submitted. The coverages that we were talking about is an underinsured motorist coverage. Underinsured motorist coverage was simple and nuanced. The simplicity of it is, from the Duffys' standpoint, is they're the victims, and to prove their case, to put a prima facie case of recovery, they have to show coverage. Selective admits it in their pleadings. They have to show injury. We proved that with the arbitration case. We have to show that the injury is within the scope of their coverage. Selective admits that in their pleadings. They simply wouldn't pay it. They said that they should get more credit against this coverage than the law would allow. The district trial court ruled that they were allowed to take the credits they were seeking that we believe contradict both the statutory law and the terms of the policy itself. In terms of the statutory law, 2279.21b4 is a very complicated statutory dictate, but it has one very overriding principle, and that is to compensate innocent victims to the full extent of the law and to the full extent of the policy coverage. The complexity of 2279.21b is hard to describe, but it comes down to the use of a vehicle as to what the coverage limits can be or should be or are required to be, and there's all different levels of that. So there are two stages of confirming what selective insurance obligations are under an uninsured motorist policy is, first, is it a policy that only covers fleet vehicles? If it's not, it's subject to the requirement that it provide underinsured motorist coverage. Second, does the policy cover, is it a fleet policy or is it a policy that covers private passenger motor vehicles? Our contention is and has been that it covers private passenger motor vehicles such that it's subject to the full terms of 2279.21b, but the full terms of that statute prohibit anti-stacking language in policies. And the nuance here is that the law will allow strictly commercial policies for motor vehicles to limit the stacking issue, to limit the extent that one policy is on top of another policy is on top of another policy. And how do you define strictly commercial policies? So the statute tries to deal with that, and they have two classifications. One, if it's a fleet policy, and it tries to be simple. It says, well, a fleet policy is if it has more than four vehicles, motor vehicles. But that statute really isn't very well defined in that sense. How many vehicles were involved? It's our contention there was only the four vehicles, which were the trucks, and the trailers would not count as a vehicle for purposes of underinsured motorist coverage. And that's the nuance part here. And what's the basis for that distinction? It's the purpose of the statute. So when you look at the statute and all the different regulations that apply to underinsured motorist coverage, they're dealing with passenger vehicles of some kind. And they specifically say and define in a separate statute what a private passenger vehicle is, and that's Chapter 5840-10 and 15. Those are, again, convoluted statutes as well. And they appear to provide an exemption from the commercial part of it to farmers and agricultural business enterprises. But within that definition of private passenger motor vehicle, there's also a separate definition of motor vehicle which talks about self-propelled vehicles and every vehicle designed to run upon the highways which is pulled by a self-propelled vehicle, which would seem to include the trailers that were part of the coverage in this case. I saw you on a reading, and my belief is that you're reading the definition in 20-4.01. Is that correct? Yes. Okay. 20-4.01 is the introductory motor vehicle statute definition that's very comprehensive and broad. And that's not the only place that the statute defines in 4.01 what a motor vehicle is. Actually, if you go down to, I think that's subpart 23. I'm not sure I lose track of the numbers. Write again. Subpart 27 is passenger motor vehicles. And that statute defines passenger motor vehicles, and it's motorcycles, it's all different kinds of vehicles, including some commercial vehicles. And then they even have a private passenger motor vehicle definition in subpart 27 of that same statute. And you know what it says? Anything we didn't say before. All these vehicles, and it gets to private passenger motor vehicles is anything that wasn't already identified. But in Chapter 58, they go through a very specific, elongated description of what a private passenger motor vehicle is. So they're using a different definition of private passenger motor vehicle in the insurance statute than they do in the regulatory statute at the beginning of Chapter 20. Thank you for that. Can we back up a little bit to this policy itself? Right. Selective policy. Was that a commercial policy, a business policy? Yes, it was a business policy. But you're saying that it doesn't need to be exclusive. It could also include vehicles that are used simply for personal purposes, non-business purposes? Yes, Your Honor. Because in a lot of these cases that we deal with from the appellate level have these business policies where we're applying it to personal vehicles. And in this case specifically, we have two specific nuances, again, with what the individual private coverage is. Mr. Duffy was an individual named insured at the start of the policy. And then they added another endorsement that says it's individual named insured. And that's at the appendix, Joint Appendix, page 186. And, you know, it's a very convoluted policy. It's over 250 pages. This one-page endorsement made Lydia Duffy a named insured. It said personal auto coverage, if any auto you own of the private passenger type is covered auto under liability coverage. Well, that's that simple seven, the covered auto, it's a list of the seven pieces of equipment that are defined in that premium page. And it says the following is added to who is an insured, family members and members are insurable for any covered auto you own of the private passenger type. So this policy specifically changed and added more insureds for use of a private passenger vehicle insured by this policy. So we contemplated having a vehicle listed on that policy that was a private passenger vehicle. So that's, even though it's a business policy, which happens. So that's why we contend. Is that a rider? Excuse me? Is that in a rider provision, that which you read from? It's part of the policy, and it's called an endorsement. It's endorsement. Yes, sir. And it says this endorsement modifies insurance provided under the following and includes business auto coverage form. So it has quite a few modifications to it, and that's why it's a very complicated policy. But what we're contending is that in Chapter 58, 40, 10, and 15, even though they only reference motor vehicle generically without any real description of it, on the fleet part of it, we contend that because it deals with underinsured motorist coverage, you're talking about passenger vehicles, not trailers. And trailers don't count on the fleet designation. And we don't have a case that specifically deals with that. That Nationwide versus Mabe case back in 96 came very close. It was an interesting case because it was Nationwide wanting Farm Bureau to add to the pot, and Farm Bureau had a policy that had two vehicles designated on it. One was a trailer, and one was a Mack truck. And at that time in 96, they were still dealing with intrapolicy stacking, stacking within a coverage, one coverage form, and then intrapolicy stacking between two coverage forms. And the court just blew out the intrapolicy stacking and said, well, it's a trailer, so that's not covered. And then they went on to the Mack truck part and said, well, that's a commercial vehicle, so it's not a private passenger motor vehicle. So we don't have intrapolicy stacking either. So that Nationwide versus Mabe case is instructive and helpful, but it doesn't really quite answer this question directly on point. And what all the cases have done is they have all said, let's look at the intent of the statute and interpret it that way. And that's why we have that McCaskill case that says, well, they said four, but they, you know, five, what's the difference? Well, it's the exact number. Yet the courts decide that if it doesn't really fit the framework of the statute and the intent of the statute, we're going to look past some of those nuances and find coverage. And so that's why we contend this is not a fleet policy. There's nothing in that policy anywhere that says fleet. They didn't even charge premiums for the trailers under the underinsured motors coverage. There was no circumstances where a trailer by itself, using a trailer by itself without a passenger vehicle, is going to have a UIM circumstance. You're not going to crash a trailer. And that's why there's no coverage for it. That's why they don't charge premiums for it, because you don't have underinsured motors coverage on a trailer. So it won't count towards the fleet number in the underinsured motorist fleet designation. And that's a significant point. So, Dern, do you have a case that supports the proposition you stated earlier, that when you're dealing with a policy which on its face is a business policy, includes a number of vehicles, that if the vehicles are being used both for personal and business purposes, that the stacking law would invalidate any set-off clause in those policies? I'm not sure I understand the question entirely, but I know there's business policy cases where the court has found it's subject to the anti-stacking provision because it either was non-fleet or because it involved a private passenger motor vehicle. Okay. I think that was what I was asking. Right. And so the Farm Bureau Dana case deals with the different policies, and that was a recent case where the court kind of undid a – I'm over my time. May I finish the question?  The Farm Bureau versus Dana case actually undid the Farm Bureau versus Gurley case that was decided years earlier, where they were going through the dichotomy between per-person and per-accident coverage, and when it's per-accident coverage settled on the liability side, we'll do per-accident UIM coverage. That's what Gurley said. And then in Dana recently, they're saying, don't get tied up in all the words. Just go with the overall philosophy of the statute. Apply to the particular facts you have before you, and then deal with the coverage in that way. So that's what the court has consistently done with all these cases. They all intermittently deal with both business auto forms and personal auto forms. The business auto forms are the ones most litigated, and most of them are the Farm Bureau cases with the agricultural side of their business. So a lot of the Farm Bureau cases are business policy forms. All right. Thank you, Mr. Doran. Thank you. Ms. Barino. Thank you, Your Honor. Thank you, Your Honor, and may it please the Court. Caroline Barino for Selective Insurance Company. I'm going to be handling or splitting the argument with my co-counsel, and I'm going to be trying to focus on the issue of whether the inter-policy stacking provision applies here and why, and whether or not there was sufficient factual evidence in the record at summary judgment to make the determination as to whether or not the vehicles under the policy classify as private passenger vehicles. So defendants argue that they should be able to use the inter-policy stacking provision under the FRA such that they could get the full $1 million policy, and that to do otherwise or to allow otherwise is to reduce UIM coverage available under the selective policy. That is not the case. The FRA allows inter-policy stacking of UIM policies only under certain circumstances, the circumstances that he mentioned that are enumerated in the actual FRA itself. And the policy there or the provisions of the FRA do not apply here, and that is for two reasons. The primary reason is that the policy is not a non-fleet policy. There is various case law that essentially interprets that provision of the FRA, the question that is presented under that provision, as being twofold. I'm sorry. What provision are you talking about? I'm talking about the provision in the FRA under Section 20-279.21B4, and so that's the language that says that provided that this sentence shall apply only to insurance on non-fleet passenger motor vehicles, as described elsewhere in other statutes. And basically the case law has interpreted this language as allowing for inter-policy stacking if the policy provides non-fleet coverage and the policy is of a private passenger type. And here, based on the actual language of the policy and the type of the policy, it is clear that this policy is not non-fleet or is a fleet policy such that the exemption here applies and the FRA provision that allows for inter-policy stacking does not apply here. Before you get too deep into that, do you agree that the nature of the policy by itself doesn't answer the question? So I understood that this was a business auto insurance policy, right, whatever that means. But that by itself doesn't mean that the Williams, in this case, or the Duffeys, I guess, wouldn't be entitled to coverage? I would actually not agree with that, Your Honor, and the reason for that is, well, under Aetna v. Fields, the court found that a business auto insurance policy, by the fact that it was a business auto policy alone, was sufficient to show that it was a fleet policy. Now, I know that counsel for defendants mentioned that there are exceptions to that, and I agree. One of the exceptions is enumerated under or was based on a holding in McCaskill, which I know that counsel for defendants mentioned, and why McCaskill doesn't apply here and why it is kind of an outlier is because McCaskill examines inter-policy stacking, which is now illegal under North Carolina law, and why that is relevant, even though Aetna also addresses inter-policy stacking, is that McCaskill relies on the fact that inter-policy stacking is at issue to determine that five vehicles there is not non-fleet or is non-fleet and is not fleet because since there were only five vehicles, that allowing it to be non-fleet would not hurt the underlying reasoning for the statute, which was to protect against allowing a claimant a windfall that they did not bargain for. That policy in McCaskill was actually a personal auto policy, which is not the case in Aetna and is not the case here. The selective policy here is actually a business auto policy. That is the distinguishing factor there. If I'm understanding your position, we could just stop there? Sorry, say that again? We could just stop there and say this is a business policy. The statute was not intended to deal with a business policy. End of story. Well, certainly that is what we would contend, is that you have to have the provision of the inter-stacking policy provision of the FRA apply to the policy. The policy has to be non-fleet and it has to cover private passenger vehicles. And because the policy here is not non-fleet or fleet, it does not apply, meaning that the FRA provision at issue does not apply to the policy, and the policy language is what rules here. So, yes, Your Honor, we could just stop right there. However, to address the other arguments of defendants, which was an argument that there was not sufficient evidence on the record to classify the vehicles under the policy as a private passenger vehicle or as non-fleet private passenger vehicles, that's simply not the case. The case law shows that you can rely on the actual terminology of the policy. The policy at issue here was attached as a part of the complaint, and by defendants' own admission, became part of the record. And so the court properly relied on that when making their determination as to whether or not vehicles under the policy were non-fleet private passenger motor vehicles, such that the inter-stacking policy provision did not apply. So we agree, or we believe, that there was sufficient evidence in the record, but also this is, on appeal, the first time that defendants have raised this argument, and so we also object to the argument on that basis. And going back into that, it says that the record showed that the vehicles were covered by a business automobile coverage insurance policy, which, even if the policy language enough, under the declarations that discusses the different types of policies, different types of vehicles listed were business vehicles, because one thing that counsel for defendants mentioned was that this was an individual policy or a policy that was issued for an individual. This was not a policy that was issued for an individual. It was a policy that was issued for Mr. Duffy doing business as Corrective Landscape Services, which would be issued to a sole proprietorship. So it was a policy, even from the beginning, whether or not lawn care, et cetera, was added as another insured later on. It was, from the beginning, a business auto policy, and the policy itself can stand for the proposition that the business, that the vehicles listed were being used for a business purpose. Excuse me. What about does it make any difference that the endorsement included Mrs. Duffy? Sir, can you say that again? The endorsement that she was on, the endorsement that she was included as a covered person, that counsel mentioned, does that make a difference? Your Honor, I do not believe that makes a difference. There is an endorsement that discusses who is considered insured under the policy, and that particular endorsement that he is referencing or that counsel for defendants is referencing is an endorsement that states that the named insured is covered under the policy, and then any family members of the named insured. Obviously, that is something. And does that person have to be doing something in a commercial nature to be covered? That person does not need to be doing something. So it's a hybrid. It's somewhat of a hybrid type of insurance policy, isn't it? Well, actually, what I would say, Your Honor, is that that particular endorsement is more of a carve-out in the fact that it is showing that there is policy for a family member like Ms. Lydia Duffy, and it is an exception to the business coverage in the sense that this particular coverage is provided under the policy, whether the vehicle being used at the time of the accident. So it's broader than a commercial policy, isn't it? Well, I think that the – You did it by – you collected the premiums to – you got paid to – it wasn't free when you added her to that, right? That – well, actually, Your Honor, that particular endorsement wasn't any additional premium. Is that in the record? That is in the record, Your Honor. That it was free. That's in the record. Well, the record has a copy of the policy in it, and in the policy it shows that the premiums are assigned to the actual vehicles. The vehicle that was involved in this accident wasn't – Well, it says that too, but, you know, my family member is on it. I'm paying the premium. Right. So the – yes, Your Honor, the way that they assign premiums here is based on certain vehicles under the policy and the nature of certain vehicles. Isn't it counterintuitive? You said you're going to give a million-dollar coverage for uninsured motorists. Then you only give up $300,000, and they have $1.9 million in certified, undisputed damages. It's something a little counterintuitive, isn't it? Well, Your Honor, it certainly may appear that way at first. It certainly does. Well, the reason that it actually doesn't apply that way is because there were actually three other – at issue, there are actually three other policies that are at issue that the defendants made claims under for UIM coverage. I know. I got the message. And due to the FRA and the public policy, the reason for the FRA and its implementation was to put the defendants back – or the claimants back into the place that they would have been had the tort fees there been adequately insured. And so here, and based on the provisions in the actual policy and policy language, it basically lays out that the maximum amount of policy coverage available is that that is the most amount of coverage under any policy. But that language does not necessarily mean that that policy – that the amounts, the coverage limits, are in addition to what has already been paid out. That would cause a windfall for the benefit of the defendants and would go beyond the public policy of the statute because it would provide them with more limits than they actually bargained for when they bargained for each of the four policies that they made claims under here. Can I ask you about this number – the number of vehicles that seems to be relevant for deciding whether or not a policy is fleet or non-fleet? So if the Duffy's had simply owned two vehicles under this selective insurance policy, even if they used the vehicles in their business full-time or part-time, do you agree that that would not be a fleet policy? I do agree that that would not be a fleet policy because I believe at that circumstance it would – the actual language of the definition of non-fleet motor vehicle would be controlling. So Mr. Dolan says that in this case that applies because these trailers are not vehicles. Right. So the trailers are vehicles under the statute, and there are cases that have interpreted that. But under the provisions of – and I apologize. I know I've gone over my time. Sorry. Your Honor, it is the provisions of section 20-4.01, subsection 23 of the North Carolina general statutes that indicates that a motor vehicle under North Carolina statutory law includes a vehicle which is self-propelled and every vehicle designed to run upon highways which are pulled by a self-propelled vehicle. And that has been interpreted to be a trailer because trailers are being pulled by self-propelled vehicles such as a pickup truck or things of that nature. All right. Thank you very much. Thank you. Mr. Peterson. Good morning, Your Honors. May it please the Court, Daniel Peterson for selective. And the part that I'm going to kind of talk about in two parts here is that, one, there was mention of it in the appellant's argument and certainly coverage of it in its brief, talking about whether selective fulfilled its obligations. And I know Judge Gregory voiced some concerns about that with my co-counsel. And then I'm also going to discuss something that was briefed in the appellant's brief about the severability of insurance provision. And certainly we'll be glad to take any of the Court's questions on anything else related to our briefing and our position, regardless of whether I'm discussing it or not. Selective tendered $300,000 to the Duffeys after the Arbital Award, and that was based off of an offset from the other uninsured motorist coverages that were available to the Duffeys, the relevant provision being in the selective policy at Joint Appendix 152, where it states the maximum recovery under all coverage forms or policies combined may equal, but not exceed, the highest applicable limit for any one vehicle under coverage form or policy providing coverage on either a primary or excess basis. That highest applicable limit is a selective limit of $1 million. And thus, the Duffeys having received, and as was admitted in their answer in this matter, that they received $700,000 in uninsured motorist coverage in addition to the tortfeasor's liability coverage, which was not sufficient to cover their injuries, which was not taken as an offset by selective. But they received the $700,000, and that's where the tender for $300,000 came to get them to the maximum limit applied in the policy. The district court got it right here by applying the Height case, and that is discussed in both briefs and in the district court's order. What about the fact that he cites the Dana case? Yes, Your Honor. Can you talk about how, and I don't think this was mentioned in your brief, so what is your argument there under the Dana case, whether that case actually supports a per-person application to the limit? Well, in the Dana case, Your Honor, the fact that there was a per-person limit and in the Height case, the policy under the Height case, there was no per-person limit, and in our selective policy, there is no per-person limit. So that's the distinguishing factor where there is a per-person limit. The Dana analysis, the per-person limit comes into effect. And, in fact, it's kind of no individual will go over the per-person limit. It doesn't stand for the proposition that this adds multiples to the coverage. So it doesn't convert the per-accident coverage of the 1 million per-accident coverage that exists in both the selective case and in the $500,000 per-accident coverage in the Height case. It does not convert that to individual per-person limits. Does that address your question, Judge Yoon? Did the Dana case include the subsection G that seems to separate insureds individually? Did it address that? No, Your Honor, it did not, and I'm glad to address severability of insureds concerns. Those – I'm sorry, Your Honor. No, no, go ahead, because I think that's – I mean, their point is that that clause seems to suggest that you take each insured individually and apply the set-off clause to each of them. Well, in all the case law that applies those severability of insureds provisions, which, as Your Honors are aware, are common in these types of policies. They may be common to you, but not to us, thankfully. Well, frankly, not to me either. But to the extent of our clients, the severability of insureds provision is, under the case law, applied to require insurers to look at each individual when applying exclusions, such that if there is intentional conduct on the part of an insured that excludes them from coverage, that the insurer cannot say, all of you that were in the car accident are out. Just that insured. That's the kind of provisions that – such as discussed in our brief in the Penske case from the Eastern District of North Carolina, and then looked on favorably in the North Carolina Court of Appeals under Universal Insurance v. Burton Farm. Those are the kinds of applicability of the severability of insureds provision. Moreover, the severability of insureds provision in this policy expressly addresses a carve-out for limits on insurance, which is, again, the $1 million per accident. So there is no case law that stands for the proposition that the severability of insureds clause expands the entitled coverage here to $1 million per insured. And there's nothing in the policy that does the same, Your Honor. In fact, it expressly limits it – carves out the limits of insurance for this very purpose. So we think that reading the policy on the whole, that would – applying the severability of insureds provision would, one, defeat the purpose of uninsured motorist coverage, which is not only to make the insured whole, but really just to put them in the same place they would have been had the tort fees been adequately insured, which they were not here. And so that is kind of the distinguishing factor on the Dana case and the severability of insureds provision. Returning to the Hite case, in Hite there is a $500,000 per accident limit. In our – in the selective policy, there's a $1 million combined limit. And in Hite, the trial court made the kind of determination that the duffies seek here, but was reversed by the North Carolina Court of Appeals. And it is where the Court of Appeals held that two insurers were collectively entitled to that per accident limit, lest any appropriate offsets from other insurance proceeds. And so the rationale for the court's holding in Hite, and as the district court applied in this case, applies here. The purpose, again, of a UIM policy is to put an injured party harmed by an underinsured tort fees or back in the same place they would have been. And so in Hite, the court concluded that Nationwide owed its insureds collectively $300,000. And on this $500,000 single combined limit, here there was $700,000 in eligible offset payments by the uninsured motorist, based on the language of our policy and based on creed v. creed 258 NCAP 564, which the trial court cited in its order, that we took out the, we accounted for the uninsured motorist payments from the other insurers, other underinsured motorist coverages. Selective did not take any offset for the primary tort fees coverage because of the specific language in our policy related to changes in conditions and the highest applicable limit that I've already discussed. That's all of the remarks I had prepared, Your Honors. I'm happy to take any questions the court may have. One question. Yes, Your Honor. Was counsel correct when he said that your policy had about 250 pages? I would believe it, Your Honor. I have no reason to disagree with that. 250 pages for a million-dollar UIM policy. I'm sorry, Your Honor. I didn't mean to interrupt you. I'm sorry. I thought you were about to end. I was going to answer. I thought the question was concluded. That's all. My apologies. It took 250 pages to explain what the coverage was? Not the uninsured motorist part, Your Honor, the underinsured motorist part, Your Honor. We attached the entire policy, which ranges from liability policy to various, again, business coverages that corrective landscape services, which is Adam Duffy's sole proprietorship business, needed. It is not just the underinsured motorist coverage. That's 250 pages, thankfully, for my sake. That's a much smaller portion of the total policy. We did feel it appropriate. It was all before the court to put it in the record. I take it in that 250 pages somewhere tells them, somewhere in there, that, listen, it says a million-dollar UIM policy, but you're not going to get that unless nobody has any insurance. Yes, Your Honor. We would contend. You're talking about, like I said, the only way you're going to get a million is if no one has insurance, and then you have, obviously, injuries that equal or exceed a million. That's in there in plain language somewhere? Your Honor, at Joint Appendix 152, the changes in conditions and other insurance policy provision identifies exactly what Your Honor is talking about in the sense that where you've got other underinsured motorist coverage available, basically, we're going to fill that gap between whatever you get paid by these other insurers to get you to the million. In that sense, it's sort of an excess policy to fill that gap up to the million dollars. Your Honor is correct. If there was no other underinsured motorist coverage available to the Duffeys, there would be a million dollars in coverage under this policy. However, under the provision at Joint Appendix 152, that is not the case, Your Honor. Thank you very much. Thank you, Your Honor. Mr. Doran. Thank you, Your Honor. I appreciate that. I want to focus specifically on the Haight decision, H-I-G-H-T. I don't know if that's the right pronunciation, but it's Haight versus Nationwide. Clearly different. Clearly illustrates the point why this coverage is here and distinguishable. There was $200,000 worth of liability insurance credit. The interesting part about that case is the liability policy actually paid $270,000 worth of payouts, and there was an unfinished claim that had another $25,000 left in that policy, and perhaps those people withdrew that claim just so the whole $300,000 wouldn't be used and so Nationwide wouldn't get the $300,000 credit. I'm not sure. But there the court only applied $200,000 liability payments against the $500,000 UIM coverage, which is what UIM is supposed to be. It's supposed to be an envelope around the liability coverage so that whatever liability fills up, UIM covers the rest. And so that case is consistent with that analysis. But when you apply the math to what Mr. Peterson just said and call what we got a windfall by counting UIM coverage for two separate individuals on top of each other is mind-boggling. When you look at the analysis, if, for example, if Ms. Duffy withdrew her claim altogether, their position is that Mr. Duffy gets $650,000 because he only had $350,000 of UIM coverage. Ms. Duffy's not making a claim under the policy. She withdrew her claim. So now their coverage increases by $350,000. So that's the absurdity of their position. They also are talking out of both sides of their mouth. They're saying, oh, over here on the other insurance coverage, we get to consider all claimants at the same time against the policy limits, as it says. This is a policy limits cap for everybody, all claims, no matter what, no matter how many cars, the top limit. Well, the top limit was supposed to be $1 million. Well, because they double up on what they're trying to collect on other insurance, a separate coverage altogether, and putting two claimants in that, their coverage goes from $1 million to $650,000 or $750,000, depending on how you deal with that extra $100,000 on liability. So we have a contradiction in how they're interpreting their policy, and it's inconsistent, and it actually violates the, quote, separability clause. I never knew there was such a thing. But in the conditions part, it says you're going to consider each claimant separately. Now, the cases get litigated over liability claims. Now, when you look at this policy, this subpart G in conditions is in the business auto form. The business auto form actually does not even talk about underinsured motorists at all. It doesn't talk about uninsured motorists at all. The endorsements for the underinsured motorist coverage is the only place we have the coverage added. And there, when they talked about limits as a separate paragraph, it says limits are $1 million. We don't care about dollars. We don't care how many claimants, how many cars, how many policies. You take the top policy, that's the most anyone gets. Then we go over here, other insurance, in conditions, just like in claimants, in conditions. So when you look at that clause, it says benefits under the policy or claimed or lawsuits under the policy. So you have two different aspects it's talking about in that subpart G. And those other cases are talking about whether they have to provide counsel for both people they were sued or whether they're considered separate insured or not. And that's a fairly complicated business question that comes up. And that's what these policies try to deal with. It also applies to the benefit part of the case. And they added a benefit part of the case through the private underinsured motorist coverage. And so that's why we contend that even if the statutory argument does not prevail under this policy, you will get each claimant separately for purposes of the other insurance clause, because that's exactly what that policy says. And if you read it any other way, then that one subpart D, where it says the insurance limits are $1 million, you just added a clause saying the coverage limits are $1 million no matter how many policies, no matter how many claims, no matter how many insureds, less whatever we decide to take off of it. Or to be more specific, less any other money that's offset by the underinsured clause. It doesn't say that there. The underinsured clause is separate, is read on its own, applied on its own, and different from the limits kept of $1 billion. So you do look at these individuals separately. You look at Mr. Duffy. He got $350,000 of UIM coverage from another source. If they get credit for that, by God, they get credit for that. That's out of $650,000 for him, total allowance. And for Mrs. Duffy, same thing. You take $350,000 off the million for her. She only has $650,000 of UIM left. And if the two of them have a claim more than that $650,000, they get the windfall of not having to pay the full loss. They get the windfall of reducing a $1.9 million claim down to whatever the million dollars is. And that's what happens when the statute's not applied. They get to take away our stacking. But they don't get to take away two claims at the same time through a different clause that doesn't apply under the limits. I am out of time, and I apologize. I'll answer any questions you all might have. Thank you very much. One question. Sure. Did the Duffys argue before the lower court that there exists a genuine issue of material fact as to the limits of insurance and then the definition of insurance? We consider all these facts really undisputed, but if you interpret this policy to be where we lose coverage for Mrs. Duffy because she pursued her claim and you add her UIM benefits to Mr. Duffy's claim, we consider that a factual determination or policy interpretation that the court shouldn't have ruled in the summary judgment fashion. And we never really got a chance to address it with the court's feeling on what he decided the ruling would be. Nobody cited the hate versus nationwide case. And during the presentation, I specifically told him in my argument, I'm not aware of any case where they counted two beneficiaries against UIM coverage in that situation. And then the hate case comes up, and they applied the benefits of two beneficiaries, the recoveries of two different insurance under one claim. But that was that $500,000 policy, and that's a little different with the liability issue as well. So the judge found a case that contradicted my argument, but that case is distinguishable, and I never got a chance to address that case in his presence. So some things he did with his order surprised us, and when we look at it and compare it to the record, we believe in that context, like with the Irwin versus Tweed case, nobody in the Tweed case even argued that there was a question of fact. And the court sent it back twice saying, yeah, but there's a question of fact from here, from the bench. That wasn't answered. You've got to go back and answer that question of fact, because it's not clear from the record that that question of fact was answered. So sometimes that happens, but we believe the facts were clear. It's not a fleet policy. We're clear our damages exceeded a million dollars, clear they had a million dollars in coverage, and they should pay it. And we felt there's no dispute to that. But when you look at the ruling, some of the things he did just don't jive with the record. There's no facts to support going beyond what each of the parties were arguing the law is. That's why we contended under Tweed you would send that back if you still felt like there was questions about some of these nuances. All right. Thank you, and I apologize for going over. Thank you. I want to thank counsel for their arguments this morning. We'll come down and greet you and move on to our final case.
judges: Albert Diaz, Roger L. Gregory, Jasmine Hyejung Yoon